UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**WESLEY SWIGER,**

      **Plaintiff,**            **Case No. 2:22-cv-3752**
  v.                            **Judge Edmund A. Sargus, Jr.**
                                 **Magistrate Judge Chelsey M. Vascura**

**CONFLUENCE CORPORATION,**
 *et al.*,
      **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants Confluence Corporation and David Patterson's Motion for Summary Judgment. (Mot., ECF No. 18.) Defendants argue that there are no genuine issues of material fact in Plaintiff Wesley Swiger's case for disability discrimination, retaliation, and failure to accommodate. (*Id.*) Mr. Swiger opposed (Opp., ECF No. 22), and Defendants replied (Reply, ECF No. 25). Mr. Swiger also moved to file a sur-reply to Defendants' Reply (ECF No. 26), which Defendants opposed (ECF No. 28).

For the reasons below, Plaintiff's Motion for leave to file sur-reply (ECF No. 26) is **DENIED** and Defendants' Motion for Summary Judgment (ECF No. 18) is **GRANTED**.

## BACKGROUND

### I.    FACTUAL BACKGROUND

This case is about whether Confluence terminated Mr. Swiger's employment because he complained about alleged discriminatory treatment related to his epilepsy.

There are several corporate entities involved in this case. Confluence is a corporation set up by David Patterson to provide oversight to other independent financial advisors. (Mot., PageID 831; Patterson Dep., ECF No. 14, 23:03–06.) The group of independent financial advisors, including Jason Black, Jerod Cook, and Jesse Etter are collectively referred to as the

1

Marquis Advisory Group. (Mot., PageID 831.) The advisors gave Confluence a portion of their commissions, in exchange for the oversight that Mr. Patterson provided through Confluence. (Patterson Dep., 23:03–06.)

Mr. Patterson created the Operations and Marketing Manager position within Confluence (which Mr. Swiger held) to support the advisors. (*Id.* at 32:01–32:03.) Mr. Swiger's position was full time and required him to travel to the office of each advisor and provide marketing, administrative, sales, and compliance support, as well as help prospect for new business. (Patterson Dep., 47:04–48:15; 57:02–07.) In exchange, Mr. Swiger was paid a salary of approximately $720 per week, or $37,000 annually. (*Id.*)

During his interview with Mr. Patterson and Mr. Black, Mr. Swiger disclosed that he had epilepsy. (Patterson Dep., 54:16–21; Swiger Dep., ECF No. 13, 64:01–20.) In Mr. Swiger's words, Mr. Patterson and Mr. Black "seemed understanding of [his] condition." (Swiger Dep., 64:02–06.) When asked, Mr. Swiger clarified that he would not require an accommodation. (Patterson Dep., 56:03–08.) With knowledge of Mr. Swiger's epilepsy, Confluence hired Mr. Swiger to begin employment in October 2018. (*Id*. at 59:01–05.)

Although Mr. Swiger suffered both grand mal and petit mal seizures,[1] he testified that he never suffered a grand mal seizure while on the job with Confluence. (Swiger Dep., 197:03–08.) He was, however, hospitalized in December 2019 while employed by Confluence for testing related to his epilepsy. (*Id.* at 174:14–18.) At that time, Mr. Swiger learned he may be a candidate for a corrective surgery and informed the advisors that he would require more time off

---

[1] A grand mal seizure (i.e., tonic-clonic seizure) can cause a person to "cry out, lose consciousness, fall to the ground, [and] have muscle jerks or spasms." While a petit mal seizure (i.e., absence seizures) are generally less severe and cause "rapid blinking or a few seconds of staring into space." Center for Disease Control (CDC), Types of Seizures, https://www.cdc.gov/epilepsy/about/types-of-seizures.htm (last visited February 9, 2024).

for testing. (*Id.* at 179:01–13.) Mr. Swiger claims that his request was met with "eye rolls," "looks of annoyance" and grumblings. (Opp., PageID 864–65; Swiger Dep., 138:07–11; 140:08–09.) Defendants refute that characterization and assert that they approved his request and that he received "supportive and encouraging messages from his colleagues." (Reply, PageID 1008.)

      A.      **Mr. Swiger's performance suffered in 2020.**

Mr. Swiger's job performance was positive in 2018 and 2019 but changed in 2020. (Patterson Dep., 85:02–10.) When Mr. Swiger was hired, Confluence did not require him to have a background in the financial services industry. (*Id.* at 80:12–16.) But Mr. Patterson and the other advisors hoped that Mr. Swiger would learn the language of the industry to better communicate with prospective clients and advisors. (*Id.*) But by October 2020, Mr. Swiger testified that he struggled to grasp the intricacies of the industry and to recruit new clients and new advisors. (Swiger Dep., 110:20–111:14; Patterson Dep., 85:15–24.) He also testified that recruitment was not his strength, and he could not point to any new client or advisor whom he recruited. (Swiger Dep., 86:16–17; 165:02–09.)

Mr. Black testified in his deposition that Mr. Swiger was not completing the tasks assigned to him. (Black Dep., ECF No. 15, 30:19–31:02.) Mr. Black recalled that he would ask Mr. Swiger to perform "the same tasks over and over again." (*Id.*) In one instance Mr. Black provided Mr. Swiger with a list of business prospects to connect with for lunch or coffee, but he never received confirmation that Mr. Swiger contacted anyone on the list. (*Id.* at 31:02–24.) Mr. Patterson reported similar frustrations. Mr. Patterson conveyed that Mr. Swiger was not a self-starter and as a result, Mr. Patterson invested a significant amount of time assigning Mr. Swiger tasks and overseeing his work product. (Patterson Dep., 133:08–14.)

### B. Defendants implemented a bonus structure to motivate Mr. Swiger's performance improvements.

Mr. Swiger requested a pay raise in 2020, but Defendants declined his request given their performance concerns. (Patterson Dep., 85:09–86:19; Swiger Dep., 125:14–126:04.) Instead, Mr. Patterson devised a bonus structure where Mr. Swiger would receive 1% of the advisors' revenues over a target threshold of $600,000. (Patterson Dep., 59:16–60:19.) Mr. Patterson hoped that aligning Mr. Swiger's bonus with the advisors' revenue goals would encourage him to recruit new clients and advisors. (*Id.*)

But the bonus structure did not have its desired effect. (*E.g.*, Patterson Dep., 131:04–17 (noting Mr. Swiger's negative change in attitude after the bonus structure).) Mr. Swiger's attitude and performance continued to decline after implementation of the new bonus structure. (*Id.*) Mr. Swiger was frustrated when he received a bonus of $1,339.55 because he believed his bonus should have been higher. (Swiger Dep., 123:21–124:08; Patterson Dep., 116:17–117:21.)

### C. Tensions between Mr. Swiger and Defendants boiled over at a meeting held on January 18, 2021.

Mr. Black and Mr. Patterson chose to address Mr. Swiger's frustrations and concerns about his performance at a meeting on January 18, 2021. (Patterson Dep., 131:07–22.) The meeting quickly turned contentious. (Black Dep., 40:20–21.) Mr. Swiger shared that he was upset that he did not receive a pay raise and that Confluence did not provide health insurance. (*Id.* at 44:18–25.) When Mr. Patterson explained he could increase his compensation through the bonus structure, Mr. Swiger said he was "not willing to work that hard." (*Id.* at 46:01–08.)

The parties dispute what happened next. Mr. Swiger testified that the conversation escalated when he mentioned that he would need to take a day off in the future for testing related to his epilepsy. (Swiger Dep., 138:03–09.) His epilepsy was worsening and he required testing to

4

determine whether he was a candidate for a corrective surgery. (*Id.* at 138:10–19.) In response to his request for time off, Mr. Swiger detected a "bit of annoyance" from Mr. Patterson and Mr. Black. (*Id.*) Mr. Swiger contends that immediately after the conversation about his epilepsy, Mr. Patterson suggested that he should find a job better suited for him. (*Id.* at 139:06–10.)[2]

Defendants refute that Mr. Patterson and Mr. Black were annoyed by Mr. Swiger's request for more time off related to his epilepsy testing. (Patterson Dep., 129:21–130:11.) Mr. Patterson says that after Mr. Swiger conveyed his dissatisfaction with the job, the bonus structure, and the lack of health insurance, Mr. Patterson suggested that if Mr. Swiger was unhappy, perhaps he should get a job somewhere that provided health insurance. (*Id.* at 129:21–24; 149:04–07.) Mr. Swiger pulled out his phone to record the conversation, and there is a recording of the conversation from there. (Swiger Dep., 141:17–21.)

The audio recording starts with Mr. Patterson saying ". . . maybe that would be a better situation for you." (*See* ECF No. 21.) When Mr. Swiger says his epilepsy should not factor into his employment, Mr. Black responds by saying "that's not at all what [Mr. Patterson] said." (*Id.*; *see also* Black Dep., 44:12–13; 49:21–24.) Mr. Swiger again characterizes the conversation as firing him because of his disability, and Mr. Patterson and Mr. Black refute that characterization. (*Id*. at 49:15–24.) Minutes later Mr. Black ends the meeting. (*Id*. at 50:17–18.)

D. **Defendants terminated Mr. Swiger after the January meeting.**

Defendants terminated Mr. Swiger's employment shortly after the January meeting. (Patterson Dep., 134:08–15.) After the meeting, Mr. Swiger returned to work. (Swiger Dep., 167:01–09.) In early February 2021, the advisors met and agreed to terminate Mr. Swiger in part

---

[2] Mr. Swiger first testified that Mr. Patterson said that he should find a job better suited for his condition. (Swiger Dep., 133:04–06.) Later in the same deposition, however, he said that Mr. Patterson suggested he find a job better suited for him. (*Id*. at 139:09–10.)

because of his behavior at the January meeting. (Patterson Dep., 134:16–24; 135:18–22.) According to Mr. Black, the January meeting was not Mr. Swiger's first contentious interaction with the advisors. (Black Dep., 51:10–22, stating that it was not Mr. Swiger's first "explosion" or outburst.) Mr. Swiger's outbursts were so common that Mr. Black said he felt uncomfortable with him in his office because he acted "very unprofessional." (*Id*.) Mr. Patterson testified that the advisors did not discuss Mr. Swiger's epilepsy or his requests for medical leave. (*Id.* at 135:23–136:11.)

Mr. Swiger went on vacation from February 25, 2021 through March 10, 2021. (Swiger Dep., 167:01–09; Black Dep., 57:02–11.) When he returned, Mr. Patterson informed him that he was terminated because his "heart wasn't in it anymore." (Swiger Dep., 188:18–22.) Mr. Swiger was replaced by Seth Currens, who was a male without a disability. (Patterson Dep., 40:17–24.)

## II. PROCEDURAL BACKGROUND

Mr. Swiger filed a charge of discrimination with the Equal Employment Opportunity Commission and received a Right to Sue Letter in August 2022. (ECF No. 1-3.) He sued in this Court soon after. (Compl., ECF No. 1.) In his Complaint, Mr. Swiger alleges that his termination was a form of disability discrimination (Counts I, II) and retaliation in violation of the Americans with Disability Act ("ADA") (Count V) and Ohio Revised Code § 4112.01 (Count VI). He also alleges that Defendants failed to provide a reasonable accommodation for his disabling condition in violation of the ADA (Count III) and Ohio law (Count IV). Lastly, he claims Mr. Patterson

aided, abetted, or compelled Defendants' discriminatory termination under Ohio law (Count VII). (Compl., ¶¶ 138–143.)

Following discovery, Defendants filed this Motion for Summary Judgment (Mot., ECF No. 18) and Motion for leave to file sur-reply (ECF No. 26). The Court first reviews the Motion for leave to file sur-reply.

## MOTION FOR LEAVE TO FILE SUR-REPLY

In their Reply, Defendants attack the credibility of Mr. Swiger's affidavit attached to his opposition brief (ECF No. 22-5) as self-serving and incapable of creating a genuine issue of material fact. (Reply, PageID 1011.) In his Motion for leave to file sur-reply, Mr. Swiger contends that these arguments are new, and requested leave to respond. (ECF No. 26.)

The rules of this Court seldom permit "additional memoranda" beyond motions, memoranda in opposition, and replies "except upon leave of the court for good cause shown." S.D. Ohio Civ. R. 7.2(a)(2). While a party may not raise new issues in a reply brief, a party may respond in its reply to arguments raised for the first time in the opposition. *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 599 (N.D. Ohio 2004) (citing *United States v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002)). Defendants' Reply permissibly responded to arguments raised for the first time in Mr. Swiger's opposition brief. Defendants' arguments about the credibility of the affidavit were new only to the extent that the affidavit was introduced by Mr. Swiger for the first time in his opposition. (*See* ECF No. 22-5.) Accordingly, Mr. Swiger's Motion for leave to file sur-reply (ECF No. 26) is **DENIED.**

7

**MOTION FOR SUMMARY JUDGMENT**

### I. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the non-moving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer, Ebeling Co., L.P.A*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the non-moving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

### II. ANALYSIS

As a preliminary matter, "Ohio disability discrimination law generally applies the same analysis as the ADA." *Schwendeman v. Marietta City Schs.*, 436 F. Supp. 3d 1045, 1059 (S.D. Ohio 2020), *aff'd*, No. 20-3251, 2020 WL 7711327 (6th Cir. Dec. 14, 2020) (citing *Johnson v.*

*JPMorgan Chase & Co.*, 922 F. Supp. 2d 658, 674 n.6 (S.D. Ohio 2013)). Ohio courts "look to regulations and cases interpreting the [ADA] for guidance in [their] interpretation of Ohio law." *Id.* (citing *Johnson*, 922 F. Supp. 2d at 674 n.6).

Thus, the analysis and determination of Mr. Swiger's ADA claim will also apply to his state-law claims. The Court will analyze Counts I and II together, as well as Counts III and IV, and V and VI, and then Count VII. The Court will begin with Mr. Swiger claims of disability discrimination (Counts I and II).

### A. Disability Discrimination (Counts I and II)

The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A plaintiff can establish a claim of disability discrimination with either direct or indirect evidence of discrimination. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016) (citations omitted). Without direct evidence, courts apply the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In the ADA context, unless an employer acknowledges that the plaintiff's disability was the reason it made its employment decision, the burden-shifting approach applies. *Ferrari*, 826 F.3d at 892.

While Plaintiff references "direct evidence" of discrimination (Opp., PageID 868), he analyzes his disability discrimination claim applying the burden-shifting framework (*Id.* at PageID 876). There is no direct evidence of discrimination in the record. Accordingly, the Court will analyze Mr. Swiger's claim of disability discrimination under the same framework.

To establish a prima facie case of disability discrimination under the ADA, a plaintiff must show: (1) he is disabled; (2) he was otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse action; (4) the employer knew or had reason to know of his disability; and (5) the position remained open or a non-disabled person

9

replaced plaintiff. *Rosebrough v. Buckeye Valley High Sch.*, 690 F.3d 427, 431 (6th Cir. 2012) (citing *Plant v. Morton Int'l Inc.*, 212 F.3d 929, 936 (6th Cir. 2000)). Defendants do not dispute that Mr. Swiger can show a prima facie case of disability discrimination. (Mot., PageID 842.)

Once a plaintiff establishes a prima facie case of disability discrimination, as Mr. Swiger does here, "the burden shifts to the [employer] to offer evidence of a legitimate, nondiscriminatory reason for the adverse employment action." *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). Defendants must put forth sufficient evidence to "support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993). But the employer's burden is one of "production, not of persuasion." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009) (citing *Bd. of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 n.2 (1978)).

i. **Defendants proffer a legitimate reason to terminate Mr. Swiger.**

Here, Mr. Patterson explained that he terminated Mr. Swiger because of "his unsatisfactory performance and unprofessional attitude." (Mot., PageID 842.) Poor performance may be a legitimate, nondiscriminatory reason for discharge. *E.g.*, *Griffin v. Sec'y of Def.*, No. 23-3220, 2023 U.S. App. LEXIS 32390, at *12 (6th Cir. Dec. 5, 2023) (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 546 (6th Cir. 2008)).

Defendants produced evidence that part of Mr. Swiger's job duties included recruiting new business for the financial advisors. (Patterson Dep., 47:04–48:15.) But Mr. Swiger never brought in new business. (Swiger Dep., 86:16–17; 165:02–09.) According to Mr. Patterson, Mr. Swiger lacked initiative and required extra guidance, which created more work for the advisors. (Patterson Dep., 133:08–17.) Mr. Black recalled that he would ask Mr. Swiger to perform "the same tasks over and over again." (Black Dep., 30:19–31:02.) And when Mr. Swiger was

10

confronted with these performance concerns at the January meeting, he said he was not willing to work harder to improve his performance and increase his compensation. (Black Dep., 46:01–08.)

Defendants accordingly met their burden of production. Mr. Swiger now must show that the "proffered reason is a pretext for unlawful discrimination." *Bryson*, 498 F.3d at 570.

### ii. Defendants' nondiscriminatory justification was not pretext.

Since Defendants rebutted the presumption of discrimination, the burden shifts to Mr. Swiger to establish that Defendants' stated reason was merely pretext for discrimination. *Texas Dep't of Cmty. Affairs v. Burden*, 450 U.S. 248, 253 (1981). Mr. Swiger must show that Defendants' proffered reason (1) had no basis in fact; (2) did not actually motivate the action; or (3) was insufficient to warrant the action. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Mr. Swiger seeks to demonstrate pretext through the second option. (Opp., PageID 871.)

To survive summary judgment on the grounds that an employer's stated reason did not actually motivate the termination, the employee must "provide evidence which tend[s] to prove that an illegal motivation was more likely than that [reason] offered by the defendant." *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 82 (6th Cir. 2020) (internal citations omitted). Thus, the "plaintiff must show *both* that the employer's proffered reason was not the real reason for its action, *and* that the employer's real reason was unlawful." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (en banc) (emphasis in original).

### a. Mr. Swiger was terminated for poor performance.

Mr. Swiger maintains he was not fired for poor performance because he was never disciplined while employed by Confluence and he received a bonus right before his termination. (Opp., PageID 874.) But Defendants offered the bonus structure to improve Mr. Swiger's performance. (Patterson Dep., 85:09–86:24.) Defendants concede that Mr. Swiger was never

11

formally disciplined. (*Id.* at 131:16–18.) The absence of a disciplinary record, however, does not affirmatively prove that Mr. Swiger performed his job duties. To the contrary, Mr. Swiger failed to recruit new business (Swiger Dep. 86:16–17; 165:02–09) and to complete assignments (Black Dep., 30:19–31:02), and required frequent reminders to finish tasks (*Id.*). Although this behavior did not result in disciplinary action, Defendants assert that these instances reveal broader performance problems.

The Court agrees that the lack of a disciplinary record is not sufficient evidence of pretext. Of course, it would have been preferable for Defendants to put Mr. Swiger on some type of performance improvement plan, but the record shows that the advisors discussed performance concerns with Mr. Swiger on January 18, 2021, and set up the bonus structure to incentivize Mr. Swiger's performance improvements.

### b. Disability discrimination was not the real reason for Mr. Swiger's termination.

Next, Mr. Swiger argues that Defendants only raised concerns about his performance after the January meeting where he complained about Defendants' alleged discriminatory treatment. (Opp., PageID 874.) The temporal proximity between the meeting and his termination, Mr. Swiger suggests, gives rise to an inference of pretext because he was terminated two months after he complained. (*Id.*) In most cases, temporal proximity alone generally cannot demonstrate pretext. *Joostberns v. United Parcel Services, Inc.*, 166 F. App'x. 783, 798 (6th Cir. 2006) (stating that "temporal proximity alone cannot create a genuine issue of material fact as to whether Defendant's proffered reason for termination was pretext, and that the actual motivation was disability discrimination").

Further in the narrow set of cases where courts infer pretext from temporal proximity, the temporal proximity is often much closer in time. *E.g.*, *Mickey v. Zeidler Tool & Die Co.,* 516

F.3d 516, 524 (6th Cir. 2008) (inferring pretext where the employee was fired the same day, immediately after the protected activity); *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010) (finding pretext when employee was fired three-weeks after protected activity). If "some time elapses" between the activity and the adverse action, "the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.*

This case is not one that falls into the narrow set of cases where temporal proximity alone is sufficient. *See, e.g.*, *Mickey*, 516 F.3d at 525 (terminating same day as protected activity). About two months passed between the time Mr. Swiger made his complaint and was terminated––not merely hours, days or even a few weeks. *Spengler*, 615 F.3d at 494 (finding that three-weeks supported an inference of retaliation in light of additional evidence). During that time, Mr. Swiger kept showing up to work, but performed only minimal tasks. (Black Dep., 57:08–11.) Seeing no change in his attitude or improvement in his performance, the financial advisors determined that Mr. Swiger was not providing a value-add to group. (Patterson Dep., 135:09–22.) Two months does not entitle Mr. Swiger to an inference of disability discrimination based on temporal proximity alone.

Additionally, it would not make sense for Mr. Patterson and Mr. Black to hire Mr. Swiger, with knowledge of his epilepsy, only to later fire him for the same reasons. "Under the 'same-actor inference' . . . the fact that the same person or group of people did both the hiring and firing over a short time frame is strong evidence that there was no discrimination involved in the later termination." *Wofford v. Middletown Tube Works, Inc.*, 67 F. App'x 312, 318 (6th Cir. 2003).[3]

---

[3] The same-actor inference here is persuasive but not dispositive. The inference is more compelling when the hiring and firing occur within a short period. *See, e.g.*, *Wofford*, 67 F. App'x at 318 (6th Cir. 2003) (hiring and firing occurred three months apart); *Mora v. Walgreen*

### c. Mr. Swiger's performance problems began before he alleged discrimination.

Defendants also argue that Mr. Swiger's performance problems started before he alleged discrimination, which weakens his pretext argument. (Patterson Dep., 85:06–85:21, describing Mr. Swiger's change in performance in 2020.) "[E]vidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." *Sosby v. Miller Brewing Co.*, 415 F. Supp. 2d 809, 822 (S.D. Ohio 2005) (Watson, J.), *aff'd,* 211 F. App'x 382 (6th Cir. 2006) (citations omitted).

Mr. Swiger's performance problems led Defendants to deny Mr. Swiger's request for a pay raise. Understandably, Mr. Swiger was discouraged by this decision, but was unwilling to implement performance improvements to increase his compensation. (Black Dep., 46:01–08.) In fact, Mr. Swiger directly stated he was just "not willing to work that hard." (*Id*.) Tensions increased after Mr. Swiger learned that his bonus would be less than he anticipated. (*Id.* at 40:01–13.) Frustrations boiled over at the January meeting where Mr. Swiger both stated that he needed more time off for testing related to his epileptic condition and accused Defendants of threatening to fire him because of his disability. (Swiger Dep., 141:07–21.) Mr. Swiger was terminated roughly two months after that meeting. (Patterson Dep., 135:18–22.)

Mr. Swiger has not offered evidence to counter Defendants' proffered reason, or affirmatively show that Defendants' real reason for terminating him was unlawful and discriminatory to survive summary judgment. *EEOC v. Ford Motor Co.*, 782 F.3d at 767 (describing the standard to survive summary judgment). Rather, Mr. Swiger's argument that he

---

*Co.*, No. 2:10-cv-884, 2013 U.S. Dist. LEXIS 40427, at *10 (S.D. Ohio Feb. 8, 2013) (termination one year after hiring). Here, Mr. Swiger was hired in October 2018 and fired in January 2021. (Patterson Dep., 59:01–59:05 (hired), 135:18–22 (fired).)

14

was terminated because of protected activity that occurred at the January meeting confuses correlation and causation. Defendants admit that Mr. Swiger was terminated, in part, because of the unprofessional way he conducted himself at that meeting, not because of his complaint about his epilepsy. (Patterson Dep., 134:10–15; 135:18–22.) Instead of offering evidence to rebut Defendants' performance concerns, Mr. Swiger concedes he struggled to understand the financial services industry and never recruited any new business. (Swiger Dep., 86:16–17; 110:20–111:14; 165:02–09.) Accordingly, his disability discrimination claim cannot survive summary judgment and the Court **GRANTS** Defendants' Motion on Counts I and II.

### B.     Retaliation (Counts V and VI)

Defendants next move for summary judgment on Mr. Swiger's state and federal retaliation claims. Mr. Swiger asserts that Defendants retaliated against him for engaging in protected conduct. (Opp., PageID 870.) The ADA makes it unlawful for an employer to discriminate against someone who "opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 12203(a). Like a discrimination claim, when a plaintiff presents only indirect evidence of retaliation, courts use the *McDonnell-Douglas* framework. *A.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013).

Mr. Swiger must show a prima facie case of ADA retaliation. Establishing a prima facie case requires showing: (1) he engaged in a protected activity, (2) Defendants were aware of that activity, (3) Defendants took an adverse employment action against him and (4) there is a causal connection between the protected activity and the adverse action. *Shelby Cty. Bd. of Educ.*, 711 F.3d at 697; O.R.C. § 4112.02(I). Defendants argue that Mr. Swiger cannot establish (1) and (4).

### i. Mr. Swiger engaged in protected activity.

Mr. Swiger engaged in protected activity at the January 2021 meeting when he complained to Mr. Patterson and Mr. Black about perceived discrimination. (Opp., PageID 868.) After he informed Mr. Patterson and Mr. Black that he would need a day off for a doctor's appointment, Mr. Swiger claims the conversation escalated to the point that Mr. Patterson suggested that he "should find a job that better suits you." (Swiger Dep., 137:18–24; 139:06–10.) He believed his job was being threatened due to his condition. (*Id.* at 171:19–20.) He asserts he engaged in protected activity by confronting Mr. Patterson at the January meeting for encouraging him to quit because of his epilepsy. (Swiger Aff., ECF No. 22-5, PageID 999.)

To demonstrate that he engaged in protected activity, Mr. Swiger must show that he challenged an employment practice that he reasonably believed was unlawful. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579–80 (6th Cir. 2000); *Kimbrough v. Cincinnati Ass'n for the Blind & Visually Impaired*, 986 F. Supp. 2d 904, 917 (S.D. Ohio 2013) (Beckwith, J.) (finding that the employee questioned, rather than challenged an employment practice). The challenged practice need not ultimately be unlawful, but the protections of the ADA cannot be invoked by making a vague charge of discrimination. *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007); *but see Stevens v. St. Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 631 (6th Cir. 2013) (noting that a complaint need not be made with "absolute formality, clarity or precision" so long as it opposes discrimination).

Construing the facts in a light most favorable to Mr. Swiger, the Court finds that Mr. Swiger did not merely question an employment practice; he opposed Mr. Patterson's suggestion that he find a different job that was more suitable to his condition. (Patterson Dep., 149:04–07.) Whether Mr. Patterson meant "better suited" to mean a job with health insurance, or one more

16

conducive to his epilepsy is immaterial because Mr. Swiger believed he was challenging an unlawful employment practice.

### ii. No causal connection exists between Mr. Swiger's protected activity and his termination.

Finally, to establish a prima facie case of ADA retaliation, Mr. Swiger must put forth sufficient evidence to raise an inference that his protected activity was likely the reason for his termination. In other words, Mr. Swiger must establish a but-for causal connection between his protected activity and his termination. *Sharp v. Profitt*, 674 F. App'x 440, 450 (6th Cir. 2016). Mr. Swiger argues that if he did not complain about discriminatory treatment at the January meeting, he would not have been fired. (Opp., ECF No. 870.)

To support this causal connection, Mr. Swiger relies on the temporal proximity between his protected activity and his termination. (Opp., PageID 869.) For the same reasons as stated above when analyzing Mr. Swiger's disability discrimination claim, temporal proximity alone is not enough to support Mr. Swiger's retaliation claim. Mr. Swiger's lack of disciplinary record and evidence that he received a bonus, also do not show that Defendants' proffered nondiscriminatory reasons for his termination were pretext. (*See* Opp., PageID 874.)

Accordingly, Mr. Swiger's retaliation claim fails for the same reasons his disability discrimination claim failed. Mr. Swiger has not put forth sufficient evidence to prove that Defendants' proffered reason for terminating him was merely a pretext for discrimination. *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997) (affirming the district court's dismissal of plaintiff's retaliation claim).

### C. Failure to Accommodate (Counts III and IV)

Defendants next move for summary judgment on Mr. Swiger's failure to accommodate claim. Mr. Swiger contends that Defendants failed to accommodate his request to work remotely more frequently. (ECF No. 1, ¶ 108–16.)

Employers covered by the ADA are prohibited from discriminating "against a qualified individual on the basis of a disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Like Mr. Swiger's other claims, the *McDonnell-Douglas* burden-shifting regime applies. *Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 735, 742 (6th Cir. 2015).

According to the ADA, discrimination includes a failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). To establish a prima facie failure-to-accommodate claim, Mr. Swiger must show that (1) he was disabled within the meaning of the ADA; (2) he was otherwise qualified for his position, with or without a reasonable accommodation; (3) Defendants knew or had reason to know of his disability; (4) he requested an accommodation; and (5) Defendants failed to provide the necessary accommodation. *Brumley v. UPS*, 909 F.3d 834, 839 (6th Cir. 2018) (citation omitted). Defendants argue that Mr. Swiger cannot establish elements (4) and (5) of his prima facie case. (Mot., PageID 847–48.)

In his Complaint, Mr. Swiger alleges that Mr. Swiger requested an accommodation to work from home as needed. (ECF No. 1, ¶ 108–16.) But Mr. Swiger's opposition brief does not include any mention of a requested accommodation. (*See* Opp. ECF No. 22.) By failing to respond and defend his claim in his opposition brief, Mr. Swiger waived his failure to accommodate claim. *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues

18

adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") (quotation omitted) (cleaned up).

Even if Mr. Swiger did not waive his claim, the record shows that Mr. Swiger had autonomy to work remotely and could have worked from home whenever he needed. (Patterson Dep., 157:16–24; Swiger Dep., 199:09–19.) Further when asked before he was hired if he would require an accommodation, Mr. Swiger said he would not. (Patterson Dep., 56:03–56:08.) Mr. Swiger testified that there were no job duties that he was unable to perform because of his epilepsy, and no special equipment or extra help he needed. (Swiger Dep., 196:05–18.)

Thus, Mr. Swiger cannot show that he requested or was denied an accommodation, and thus cannot establish a prima facie case. Accordingly, his ADA failure to accommodate claim fails and Defendants' Motion is **GRANTED** as to Counts III and IV.

### D. Aiding and Abetting (Count VII)

As Mr. Swiger's underlying disability discrimination, retaliation, and failure to accommodate claims fail, his claim against Mr. Patterson of aiding and abetting disability discrimination under Ohio law necessarily fails as well. *Toth v. Cardinal Health 414 LLC*, No. 1:17-cv-00370, 2020 U.S. Dist. LEXIS 45833, at *30 (S.D. Ohio Mar. 17, 2020) (Barrett, J.).

## CONCLUSION

For the stated reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment on all Counts. (ECF No. 18.) Plaintiff's Motion for leave to file sur-reply (ECF No. 26) is **DENIED.** The Clerk is **DIRECTED** to **ENTER JUDGMENT** and **CLOSE** the case.

IT IS SO ORDERED.

**3/12/2024**                                        s/Edmund A. Sargus, Jr.
**DATE**                                             EDMUND A. SARGUS, JR.
                                                     UNITED STATES DISTRICT JUDGE